WELCH, J.
|2The defendant, Robert Letell, was charged by bill of information with one count of fourth-offense operating a vehicle *1134 while intoxicated[1] (DWI) (count I), a violation of La. R.S. 14:98; one count of vehicular homicide (count II), a violation of La. R.S. 14:32.1; and three counts of first degree vehicular negligent injuring (counts III-V), violations of La. R.S. 14:39.2, and pled not guilty. Prior to trial, the State elected to nol-pros counts III-V. Following a jury trial on counts I and II, the defendant was found guilty as charged on both counts.[2] On count I, he was sentenced to thirty years at hard labor without benefit of probation, parole, or suspension of sentence and was fined $5,000. The court ordered the sentence would be served consecutively to the defendant’s sentence on a previous fourth-offense DWI. On count II, he was sentenced to thirty years at hard labor and was fined $5,000. The court ordered that the first five years of the sentence were to be served without benefit of probation, parole, or suspension of sentence. The court also ordered that the sentence was to be served consecutively to the sentence imposed on count I.
The defendant now appeals, filing a counseled and a pro se brief. In his counseled brief, he contends the trial court erred in denying a motion to withdraw filed by trial defense counsel and erred in imposing sentences which were unconstitutionally excessive because they constituted multiple punishment. In his pro se brief, he contends the trial court: erred in denying the defendant’s constitutional right to self-representation; erred in refusing to allow the defendant |ato testify; erred in admitting the results of the blood-alcohol test into evidence without certificates of maintenance technicians; erred in admitting evidence in violation of the defendant’s due process rights; and erred in denying the motion to suppress evidence. For the following reasons, we affirm the convictions and sentences on counts I and II.
FACTS
On February 18, 2010, at approximately 4:00 p.m., the victim, Willie Joseph Galli-ano, Sr., was killed after his vehicle was struck by the defendant’s white Ford F250 truck on Louisiana Highway 308 in La-fourche Parish. The victim was thirty-eight years old at the time of his death. He had four children, and his wife was pregnant with their first son.
A vehicle driven by Frances Louise Addison was also struck by the defendant’s vehicle during the incident. As she was driving through a curve headed southbound on Louisiana Highway 308 with her two children, she saw a large white Ford truck headed northbound. The truck was going approximately seventy-five or eighty miles an hour, was not under the driver’s control, and hit Addison’s vehicle “broadside.” Addison’s vehicle “flipped,” and landed on its wheels. Addison was sure a white male was driving the vehicle. She did not see anyone else in the vehicle.
Trisha Bourque Lombas was driving northbound on Louisiana Highway 308 *1135 with her four children shortly before the incident. The speed limit was fifty-five miles an hour, but Lombas was in the habit of driving approximately five miles faster than the speed limit. A white pickup truck approached her from the rear, traveling at “a crazy speed,” and was about to ram the rear of her vehicle, so she increased her speed. The truck attempted to pass Lombas’s vehicle, but another vehicle was in the southbound lane, which forced the truck to pull back behind Lom-bas’s vehicle to avoid a head-on collision. The truck again drove to the rear of LLombas’s vehicle, and she again drove faster to avoid being hit. The truck then passed Lombas’s vehicle, but went into a curve, forcing a vehicle headed southbound to go into the grass to avoid a head-on collision. Lombas “got a very good glimpse” of the driver of the truck in her rearview mirror on the side of her vehicle. She identified the defendant in court as the driver. She had no doubt in her identification. She also saw the defendant at the accident scene after she stopped to help a woman and child whose vehicle had been struck by the truck. The defendant was by the open door of the white truck. He was on the ground, holding his stomach and crying.
Tommy Mayet was driving southbound on Louisiana Highway 308 shortly before the incident. He believed the speed limit lowered to forty miles per hour in the curves in the area. While Mayet was in a curve, he saw a light-colored Ford F250 pickup truck traveling in the opposite lane at “a very, very high rate of speed.” The truck went off the road, and Mayet anticipated the truck would overcorrect and possibly hit him. The truck did exactly as Mayet predicted and “barely missed” striking Mayet’s vehicle. Following the collision with the victim’s vehicle, Mayet saw the defendant lying by the white truck. At trial, Mayet indicated the driver of the truck “looked very similar” to the defendant in court.
Louisiana State Troopers Keith Gros, Jr., and Dawn Celestine investigated the crash scene following the incident. Trooper Gros found yaw marks left by the defendant’s truck, consistent with the vehicle spinning out of control. Trooper Celestine found tire marks from the defendant’s lane of travel indicating his vehicle had driven off the roadway. The point of impact was in the southbound lane.
Trooper Celestine also spoke to the defendant in the hospital on the day of the incident. He had a strong odor of alcohol on his breath. He initially claimed that, at approximately noon on the day of the incident, he stopped at an unknown | Sgas station and was carjacked by a black male, who took control of his vehicle. The defendant stated he drank a pint of vodka to calm his nerves and could not remember what happened thereafter. After Trooper Celestine confronted the defendant with the accounts of the witnesses, the defendant stated he must have been driving “if that is what the witness said.” He also stated he had killed a man and should “receive the same punishment the man I killed got.”
Louisiana State Trooper Michael Lynn Satcher also visited the defendant at the hospital on the day of the incident. He too detected an odor of alcohol on the defendant’s breath. Trooper Satcher performed a horizontal gaze nystagmus test on the defendant. The defendant failed the sobriety test. Because the defendant had been involved in an accident involving a fatality, he was required to submit to blood-alcohol testing. Additionally, Trooper Satcher indicated he twice advised the defendant of *1136 his Miranda[3] rights: once when he initially met the defendant and again when he read him the rights relating to the chemical test for intoxication form. The defendant refused to sign the form. Thereafter, his blood was drawn at 7:04 p.m. His blood-alcohol content was .22 grams percent. He was on parole from an earlier conviction for fourth-offense DWI.
EXCESSIVE SENTENCE; DOUBLE JEOPARDY
In counseled assignment of error number 2, the defendant argues sentencing him for vehicular homicide and for fourth-offense DWI was excessive and placed him in double jeopardy, due to the use of his blood-alcohol level to support both convictions.
DOUBLE JEOPARDY
The federal and state constitutions both provide that no person shall twice be put in jeopardy of life or liberty for the same offense. U.S. Const, amend. V; La. | fiConst. art. I, § 15. The Double Jeopardy Clause protects the accused against multiple punishments for the same offense as well as a second prosecution for the same offense after acquittal or conviction.
In determining whether or not the double jeopardy prohibition has been violated, the Louisiana Supreme Court has recognized two different tests, ie., the test established in Blockburger v. U.S., 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932),[4] and the “same evidence” test. See State v. Murray, 00-1258 (La.9/18/01), 799 So.2d 453, 456. Nevertheless, in recent years, the Louisiana Supreme Court has principally relied on the “same evidence” test when evaluating double jeopardy claims.
Under the “same evidence” test, if the proof required to support a finding of guilt of one crime would also support conviction of another crime, the prohibition against double jeopardy bars a conviction for more than one crime. See State v. LeBlanc, 618 So.2d 949, 957 (La.App. 1st Cir.1993), writ denied, 95-2216 (La.10/4/96), 679 So.2d 1372.
The “same evidence” test focuses on the actual physical and testimonial evidence necessary to secure a conviction. This test depends on the proof required to convict, not the evidence actually introduced at trial. Thus, under the “same evidence” test, the court’s concern is with the “evidential focus” of the facts adduced at trial in light of the verdict rendered, ie., how the evidence presented goes to satisfy the prosecution’s burden of proof. Therefore, if the evidence required to support a finding of guilt of one crime would also support a conviction for another offense, the defendant can be placed in jeopardy for only one of the two. State v. Sandifer, 95-2267 (La.9/5/96), 679 So.2d 1324, 1329.
The crime of fourth offense DWI is the operating of any motor vehicle “when: (a) [t]he operator is under the influence of alcoholic beverages; or (b) [t]he operator’s blood alcohol concentration is 0.08 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood[,]” when the offender has three prior convictions as defined in La. R.S. 14:98(F)(1). See La. R.S. 14:98(A)(1).
*1137 Louisiana Revised Statute 14:82.1(A) defines vehicular homicide as, in pertinent part, the:
killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle ... whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exists and such condition was a contributing factor to the killing: (1) [t]he operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662[;] (2) [t]he operator’s blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.... (4) [t]he operator is under the influence of alcoholic beverages.
Under the vehicular homicide statute, the State, in order to convict, must prove that an offender’s unlawful blood-alcohol concentration, combined with his operation of a vehicle, caused the death of a human being. The evident purpose of the statute is to curb traffic fatalities caused by the consumption of alcohol. It is not aimed at persons involved in vehicular fatalities whose alcohol consumption does not cause, but merely coincides with, such an accident. The statute should be construed to require proof of a causal relationship between an operator’s unlawful blood-alcohol concentration and the death of the victim in order to convict. State v. Dickinson, 2008-0558 (La.App. 1st Cir.11/3/08), 5 So.3d 179,183, writs denied, 2008-2813 and 2008-2876 (La.6/5/09), 9 So.3d 870. Operating a vehicle while intoxicated is not a responsive verdict to a charge of vehicular homicide. La.C.Cr.P. art. 814(A)(7.1). Additionally, Louisiana has not adopted a “same transaction” test which would 1 ^prohibit prosecutions for different crimes committed during one sequential, continuing course of conduct. Rather, in Louisiana, double jeopardy does not protect an offender who goes on a crime spree and violates numerous statutory provisions. See City of Baton Rouge v. Jackson, 310 So.2d 596, 598 (La.1975).
In the instant case, the evidence required to support a vehicular homicide conviction would not support a conviction for fourth-offense driving while intoxicated. The State would also have to establish that the defendant had three pri- or offenses as defined in La. R.S. 14:98(F)(1). Similarly, the evidence required to support a fourth-offense driving while intoxicated conviction would not support a conviction for vehicular homicide. Additional evidence would be needed to establish that the defendant’s unlawful blood-alcohol concentration or intoxication, combined with his operation of a vehicle, caused the death of a human being and that a causal relationship existed between the unlawful blood-alcohol concentration or intoxication and the death of the victim. If the State failed to establish this causal element, the evidence could establish guilt of DWI, while failing to establish guilt of vehicular homicide. Moreover, as pointed out by the State, in this case, separate and apart from the evidence of the defendant’s blood-alcohol level after the incident, the State presented testimony at trial that established that the defendant was driving at an excessive speed and could not maintain control of his vehicle prior to the collision with the victim’s vehicle, and that immediately thereafter, he smelled of alcohol and failed a field sobriety test. Thus, the State presented independent evidence to establish the defendant was driving while intoxicated prior to his causing the death of the victim.
*1138 Accordingly, the defendant was not placed in double jeopardy.
EXCESSIVE SENTENCE
The Louisiana Code of Criminal Procedure sets forth items which must be considered by the trial court before imposing sentence. La.C.Cr.P. art. 894.1. The Iptrial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the criteria. In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court’s stated reasons and factual basis for its sentencing decision. State v. Hurst, 99-2868 (La.App. 1st Cir.10/3/00), 797 So.2d 75, 88, writ denied, 2000-8053 (La.10/5/01), 798 So.2d 962. Remand for full compliance with Article 894.1 is unnecessary when a sufficient factual basis for the sentence is shown. State v. Harper, 2007-0299 (La.App. 1st Cir.9/5/07), 970 So.2d 592, 602, writ denied, 2007-1921 (La.2/15/08), 976 So.2d 173.
Louisiana Constitution Article I, Section 20 prohibits the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant’s constitutional right against excessive punishment and is subject to appellate review. Generally, a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one’s sense of justice. A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. Hurst, 797 So.2d at 83.
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C.Cr.P. art. 883. Thus, La.C.Cr.P. art. 883 specifically excludes from its scope sentences that the court expressly directs to be served consecutively. Furthermore, although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of ImConduct, consecutive sentences are not necessarily excessive. State v. Palmer, 97-0174 (La.App. 1st Cir.12/29/97), 706 So.2d 156, 160.
Whoever commits the crime of vehicular homicide shall be fined not less than two thousand dollars nor more than fifteen thousand dollars and shall be imprisoned with or without hard labor for not less than five years nor more than thirty years. At least three years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the operator’s blood alcohol concentration is 0.15 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the offender was previously convicted of a violation of La. R.S. 14:98, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. The court shall require the offender to participate in a court-approved substance abuse program and may require the offender to participate in a court-ap *1139 proved driver improvement program. La. R.S. 14:32.1(B).
On a conviction of a fourth or subsequent offense DWI, notwithstanding any other provision of law to the contrary and regardless of whether the fourth offense occurred before or after an earlier conviction, the offender shall be imprisoned with or without hard labor for not less than ten years nor more than thirty years and shall be fined five thousand dollars. La. R.S. 14:98(E)(l)(a). If the offender has previously received the benefit of suspension of sentence, probation, or parole as a fourth offender, no part of the sentence may be imposed with benefit of suspension of sentence, probation, or parole, and no portion of the sentence shall be imposed concurrently with the remaining balance of any sentence to be served for a prior conviction for any offense. La. R.S. 14:98(E)(4)(b) (prior to its amendment by 2010 La. Acts No. 801, § 1).
|nOn count I, the defendant was sentenced to thirty years at hard labor without benefit of probation, parole, or suspension of sentence and was fined $5,000. The court ordered the sentence to be served consecutively to the defendant’s sentence on a previous fourth-offense DWI. On count II, he was sentenced to thirty years at hard labor and was fined $5,000. The court ordered the first five years of the sentence to be served without benefit of probation, parole, or suspension of sentence. The court also ordered that the sentence was to be served consecutively to the sentence imposed on count I.
The court indicated it was imposing consecutive sentences because the defendant had committed serious violations and, in the eyes of the law, he was the worst type of offender. The court noted the defendant had been arrested seven times and convicted at least four times for driving while intoxicated since 1995. He had been on probation at least twice as a felony offender for DWI, but had continued to violate the law. His latest violations took the life of the victim and nearly resulted in the serious bodily injury or death of other citizens of the community. The court stated the defendant’s criminal history and probation history indicated there was little likelihood that he could be rehabilitated. The court found the defendant’s “being free to be able to drive a motor vehicle again even for one day [would be] a serious risk and danger for any community and cannot be tolerated.”
The court stated it had imposed maximum sentences, because the defendant was the worst type of offender and these were the most serious offenses due to the defendant’s history of DWI, due to his history of continuously putting others at risk, and due to his reckless and intoxicated driving on the day of the offenses, which took the life of the victim and nearly killed several other motorists and their passengers. The court found the actions of the defendant were “senseless, selfish, and beyond reason.” The court also found any lesser sentences would deprecate |i2the seriousness of the offenses, The court indicated no factors in the case mitigated against maximum, consecutive sentences.
A thorough review of the record reveals the trial court adequately considered the criteria of Article 894.1 and did not manifestly abuse its discretion in imposing the sentences herein. See La. C.CrJP. art. 894.1(A)(1), (A)(3), (B)(5), (B)(9), (B)(12), & (B)(21). Additionally, the sentences imposed on counts I and II were not grossly disproportionate to the severity of the offenses, and thus, were not unconstitutionally excessive. Maximum sentences may be imposed for the most serious offenses and the worst offenders, or when the offender poses an unusual risk *1140 to the public safety due to his past conduct of repeated criminality. State v. Miller, 96-2040 (La.App. 1st Cir.11/7/97), 703 So.2d 698, 701, writ denied, 98-0039 (La.5/15/98), 719 So.2d 459. The instant offenses are the most serious offenses, the defendant is the worst type of offender, and he poses an unusual risk to the public safety due to his past conduct of repeated criminality. As noted by the trial court, the defendant’s “being free to be able to drive a motor vehicle again even for one day [would be] a serious risk and danger for any community and cannot be tolerated.”
This assignment of error is without merit.
CONFLICT OF INTEREST
In counseled assignment of error number 1, the defendant argues the trial court erred when it denied trial counsel Gary-land Wallis’s motion to withdraw, because the defendant’s filing of a complaint against Wallis created a conflict of interest.
In determining whether or not a conflict exists, courts often look to the Rules of Professional Conduct. Furthermore, the Louisiana Supreme Court has determined that the ethical rules which regulate attorneys’ law practices have been recognized as having the force and effect of substantive law. The burden of proving disqualification of an attorney or other officer of the court rests on the 11?,party making the challenge. See State v. Craddock, 2010-1473 (La.App. 1st Cir.3/25/11), 62 So.3d 791, 797, writ denied, 2011-0862 (La.10/21/11), 73 So.3d 380.
Louisiana State Bar Articles of Incorporation, Art. XVI, Rules of Prof. Conduct, Rule 1.7, provides:
(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
(2) the representation is not prohibited by law;
(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
(4) each affected client gives informed consent, confirmed in writing.
Trial commenced in this matter on September 14, 2011. Indigent defender board attorney Garyland Wallis first appeared with the defendant for a pretrial conference on May 27, 2010. On September 12, 2011, Wallis filed a motion to withdraw, setting forth that, “[Wallis] may have a conflict with the defendant and that ethical issues have [arisen] between mover and defendant, therefore to avoid any ethical issues as well as the appearance of impropriety, mover should be allowed to withdraw as counsel of record.” Attached to the motion was a September 8, 2011 letter from the Louisiana Attorney Disciplinary Board, Office of the Disciplinary Counsel (LADB), indicating that, on August 26, *1141 2011, that office had received a | ucomplaint from the defendant alleging misconduct by Wallis, specifically ineffective assistance of counsel. The only action on the complaint reflected in the LADB letter was the assigning of an administrative file number for “internal ease of future reference.”
The hearing on the motion was held on September 18, 2011. The defendant testified he had filed a complaint against Wallis for ineffective assistance of counsel. The defendant claimed Wallis had failed to communicate with him, failed to perform his duties in an adequate way, failed to argue the defendant’s issues in his motion to suppress, and was part of a conspiracy to convict him. Wallis argued that given the defendant’s complaint against him, as well as the defendant’s “continuous and constant resistance” to Wallis’s representation, Wallis was in a state of mind that made it difficult for him to represent the defendant. The State argued Wallis had adopted motions filed by the defendant and every issue raised by the defendant had been addressed. The State pointed out it was the eve of trial, and “all we have is the paranoid delusions of the defendant sitting in the box over here. That’s not the basis for this motion. If they can’t get along, that’s fine. If he wants to hire his own attorney, that’s fine. But Mr. Wallis is appointed to represent him. He can’t pick and choose who he gets.” The court denied the motion, finding:
[The defendant] made a request to represent himself. The [c]ourt originally granted it and then I changed my mind and said that he could not because after interviewing [the defendant] and listening to his statements, I was convinced and still am that [the defendant] is not capable of representing himself in this case, should not be allowed to do that, it’s not in his best interest. He’s facing serious charges, that, if convicted, could incarcerate him for a lot of years.
[The defendant] in his effort to have his way to represent himself, has made complaints about me, made complaints about Mr. Wallis, made complaints about [counsel for the State], made complaints about the jail.
[[Image here]]
[The defendant] is very aware of the professionalism that has been reflected in the handling of his case. If I acted unprofessionally in his case, I would have already had a response from the people who monitor my activities. If [counsel for the State] and Mr. Wallis hadjj^acted unprofessionally, they would have already had some response from the people that monitor their activities.
This is not a post-trial motion, post-conviction relief motion based on inadequacy of counsel. We hadn’t even had the trial, yet, and [the defendant] is already making his allegations of inadequate assistance of counsel.
So, [the defendant], understandably, does not want to go to trial in this case. I understand that. No one who is accused of crime wants to face their accuser and face a day of judgment. I understand that. [The defendant] has every right to his feelings and his opinions. But I will not entertain motions that are obviously calculated to be the basis of further delay in this case.
Mr. Wallis is a professional. He’s practiced law in this division, for many years. I have no doubt about his capacity to represent [the defendant]. We all are called upon in our professional lives to perform functions that sometimes we would rather avoid, but because of our responsibilities we are called to perform those functions. Many times we’re able to withdraw from them but in certain instances we are not.
*1142 The complaint that [the defendant] has lodged with [LADB], no doubt in my mind that that was lodged to form the basis for a continuance in this case so that he can proceed on to try to ñnd a Court of Appeal or a Supreme Court that will allow him to represent himself.
In the instant case, the trial court did not abuse its discretion in denying Wallis’s motion to withdraw. The defendant failed to carry his burden of proving Wallis had violated the Louisiana State Bar Articles of Incorporation, Art. XVI, Rules of Prof. Conduct, Rule 1.7. The defendant’s filing of a complaint against his appointed counsel with LADB was insufficient to create a conflict of interest in this matter. See State v. Leger, 2005-0011 (La.7/10/06), 936 So.2d 108, 145, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (“[w]e find no abuse in the trial court’s discretion in failing to remove appointed counsel Colwart based on this claim of conflict of interest. In effect, there was no conflict of interest because the state bar disciplinary counsel had refused to accept the defendant’s complaint, since it dealt with a claim of ineffective assistance of counsel.”).
This assignment of error is without merit.
BRIGHT TO SELF-REPRESENTATION
In pro se assignment of error number 1, the defendant argues the trial court erred in denying him his constitutional right to self-representation and presentation of his own defense.
An accused has the right to choose between the right to counsel, guaranteed in the state and federal constitutions, and the right to self-representation. U.S. Const, amend. VI; La. Const, art. I, § 18. However, the choice to represent oneself must be clear and unequivocal. Requests which vacillate between self-representation and representation by counsel are equivocal. Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each. State v. Dudley, 2006-1087 (La.App. 1st Cir.9/19/07), 984 So.2d 11, 26, writ not considered, 2008-1285 (La.11/20/09), 25 So.3d 783.
The defendant was arraigned on April 15, 2010. Thereafter, he appeared in court on May 27, 2010, represented by Garyland Wallis of the indigent defender board. Trial was set for November 16, 2010. The defendant subsequently appeared in court with Wallis for a status hearing on August 11, 2010, and for motion hearings on September 23, 2010, and October 15, 2010. At the October 15, 2010 hearing, the trial court noted the defendant had indicated he wished to represent himself. In response to questioning by the court, the defendant indicated his education consisted of “ten years in high[]school and five years in law.” He clarified, however, that he had no legal education, but had studied both art and law while incarcerated for five years. He stated he was not under present treatment for mental illness, but had been treated for depression a year earlier. He indicated he had drafted certain pleadings submitted to the court. Although he initially refused to answer whether or not he had assisted other inmates on legal issues, he subsequently admitted that he had. The 117court allowed the defendant to represent himself “at this point.” Thereafter, the defendant represented himself on a motion to quash use of a predicate DWI offense and a motion to suppress the *1143 results of blood testing.[5] Following a hearing, the court denied the motion to quash.
On November 9, 2010, the court revisited the issue of the defendant representing himself. The court noted the defendant was facing charges of vehicular homicide, vehicular negligent injuring (three counts), and fourth-offense DWI. The court stated it had interviewed the defendant in court on October 15, 2010, and in chambers concerning his representing himself. The court advised the defendant that by exercising his constitutional right to represent himself, he was waiving his right to be represented by a lawyer of his choice or, if he could not afford a lawyer, by a lawyer appointed to represent him. The defendant stated he had been denied the right to confront his counsel, had “tried to work things [out] with him[,] and it just hasn’t worked.” The defendant stated he would “love to have Mr. Wallis represent him if [they] could sit down, work things out[.]” The court then entered into the following colloquy with the defendant:
[Court]: But I just wanted to give you an opportunity to again make a reasonable decision about how you want to proceed. You have a right to represent yourself but I’m required by law to make sure that you’re making a knowing and intelligent waiver of your right to counsel and also to make sure that you understand the disadvantages of not having an attorney.
You know, even though you have had an opportunity to read cases about the charges against you and you have access to the Code of Criminal Procedure and maybe to other materials in your library at the facility where you are, you still are at a disadvantage because you have not had formal training and have not had an opportunity to be in the courtroom to practice trial techniques or even to observe others doing that.
So, you realize that even though you maybe are more versed in this case than other people would be versed in theirs, that you’re still at [ 18a disadvantage because you are not an attorney by education or by experience. You understand that?
[Defendant]: Yes, sir. I understand that.
[Court]: And you’re willing to, still to go forward and to represent yourself in this case?
[Defendant]: Well, I would rather, if I could, I’d rather have Mr. Wallis be the trial lawyer, but I’d like to argue my issues in my motion, if that would, if we could come to some kind of agreement on that or let me be co-counsel with [him] to argue my issues.
[State objection]
[Court]: No, you can’t do that. You either are represented by Mr. Wallis or you represent yourself.
[Defendant conferred with Wallis]
[Defendant]: Well, [Wallis] thinks it’s best I do represent myself, so, I have no other choice than keep moving on. But far as trial, no, I’m not capable of handling a trial.... But I am capable of handling my motions and I’d like to handle my motions if possible or get another lawyer that can.
[Off-the-record bench conference between the court, State, Wallis, and the defendant]
[Court]: [Defendant], based on your statements here in court this morning and your understanding that you would be at a severe disadvantage at trial, and *1144 your statement that you wished to handle the motions but not the trial and I’ve explained to you at the conference that we had up- at the bench that that’s just not practical and it’s not in your best interest, that I don’t believe that you really want to do that, in fact, you’ve told me you don’t want to do that.
[[Image here]]
[Court]: So, after listening to what you have to say and recalling the way that you handled yourself here the last time, and considering the facts of this case and how complicated some of these issues are going to be, I am now satisfied and I am changing my mind, basically, after listening to you here today and recalling the events of October the 15th, I am now not convinced that you are competent to do . that and I am going to refuse to allow you to do that because I don’t think it’s in your best interest, I don’t think that you’re competent to handle the representation in this case.
Thereafter, the trial court reappointed the public defender to represent the defendant and advised the defendant he had the right to apply to this court for | ^supervisory review of the ruling denying his motion for self-representation. Additionally, over the objection of the State, the court stayed the proceedings for fifteen days to allow the defendant to seek review from this court. The defendant timely filed a pro-se application for supervisory relief from this court, but failed to challenge the trial court’s denial of his motion for self-representation therein.[6] We denied the writ application. State v. Letell, 2010-2187 (La.App. 1st Cir.2/9/11) (unpublished).
This assignment of error is without merit.
DENIAL OF RIGHT TO TESTIFY
In' pro se assignment of error number 2, the defendant argues the trial court erred in refusing to allow him to testify at trial. He claims he told his counsel that he wanted to testify, and he (the defendant) “was not in the court room [sic] at the close of the evident [sic].”
Following the presentation of evidence by the State, the defense indicated it did not wish to present any evidence. The record indicates the defendant was present in the courtroom. Thereafter, between the closing argument of defense counsel and rebuttal by the State, the defendant stated he wanted to testify. The trial court instructed the defendant to remain silent.
There was no error. See La.C.Cr.P. art. 765(5) (“The normal order of trial shall be as follows: ... (5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument. (emphasis added)”); State v. Caillier, 450 So.2d 43, 46 (La.App. 3d Cir.), writ denied, 456 So.2d 168 (La.1984) (“In criminal cases[,] the right to testify in one’s own behalf is a carefully protected right. However, Louisiana legislation and jurisprudence have articulated guidelines to maintain an orderly trial while still being fair to the defendant. The trial court was | gpcorrect in denying defendant’s request to take the stand after his trial was over and the closing arguments had begun.”).
This assignment of error is without merit.
ADMISSIBILITY OF RESULTS OF BLOOD-ALCOHOL TESTING
In pro se assignment of error number 3, the defendant argues the trial court erred *1145 in admitting the results of the blood-alcohol test into evidence, because the State failed to produce certificates of maintenance technicians concerning the testing machine’s proper functioning. In pro se assignment of error number 5, the defendant argues the trial court erred in denying the motion to suppress the evidence, because he was required to submit to the blood test before being “placed under arrest, or read his rights to refuse; or Mir-andize [sic].”
A motion to suppress is available to question the admissibility of chemical test results that can result in the legal presumption of intoxication. State v. Shirley, 2008-2106 (La.5/5/09), 10 So.3d 224, 232. Before the State may avail itself of the statutory presumption of the defendant’s intoxication, arising from chemical analysis of his blood, it is incumbent on the State to show strict compliance with the detailed procedures adopted to secure the efficacy and reliability of the chemical test. Id. La. R.S. 32:661, in pertinent part, provides:
A. (1) Any person, regardless of age, who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of R.S. 32:662, to a chemical test or tests of his blood, breath, urine, or other bodily substance for the purpose of determining the alcoholic content of his blood, ... if arrested for any offense arising out of acts alleged to have been committed while the person was driving ... a motor vehicle while believed to be under the influence of alcoholic beverages....
La. R.S. 32:662, in pertinent part, provides:
A. The chemical test or tests as provided for by this Part shall be subject to the following rules and shall be administered as provided for hereafter:
(1) Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving ... |2i while under the influence of alcoholic beverages the amount of alcohol in the person’s blood at the time alleged as shown by chemical analysis of the person’s blood, urine, breath, or other bodily substance shall give rise to the following presumptions:
[[Image here]]
(c) If the person had a blood alcohol concentration at that time of 0.08 percent or more by weight, it shall be presumed that the person was under the influence of alcoholic beverages.
Prior to amendment by 2012 La. Acts, No. 262, La. R.S. 32:662.1 provided:
In all criminal cases where intoxication is an issue, any certificate or writing made in accordance with the provisions of R.S. 32:663, including but not limited to intoxilyzer machine recertifi-cation forms, and other certificates or writings made with respect to the chemical analyses of a person’s blood, urine, breath, or other bodily substance, shall be admissible as evidence.
Prior to amendment by 2012 La. Acts, No. 592, La. R.S. 32:666, in pertinent part, provided:
A. (l)(a)(i) When a law enforcement officer has probable cause to believe that a person has violated R.S. 14:98, ... that person may not refuse to submit to a chemical test ... in any case wherein a fatality has occurred ... in a crash involving a motor vehicle[.] ... The law enforcement officer shall direct that a chemical test be conducted of a person’s blood, urine, or other bodily substance, or perform a chemical test of such person’s breath, for the purpose of determining the alcoholic content of his blood....
*1146 La. Administrative Code, Title 55, part I, § 555, provides, in pertinent part:
A. The certified analyst shall inspect instrumentation and equipment immediately before analysis is begun to insure that the instrument is operating properly and that test results will be accurate and within the tolerances indicated below.
B. The methods approved for alcohol analysis of blood are:
1. gas chromatography — headspace sampling with internal standard;
2. gas chromatography — direct injection with internal standard.
C. Procedures shall include the following controls in conjunction with each batch of samples analyzed:
1. a system blank analysis;
2. analysis of a whole blood control of known alcohol content |22within the range 0.04 grams percent to 0.40 grams percent the result of which analysis must coincide with the known blood alcohol value of the control specimen ±0.01 grams percent if validity is to be assigned to the results for the batch analyzed.
D. Replicate analysis shall be performed in order to eliminate the possibility of undetected errors.
E. Results shall be expressed in terms of percent w/v (grams percent) that is, grams of alcohol per 100 milliliters of blood rounded downward to the second decimal place, for example, 0.237 grams percent shall be reported as 0.23 grams percent.
F. Analytical procedures for determining the concentration of alcohol in the blood shall meet the following requirements.
1. The accuracy of the procedures shall be such as consistently to attain results within ±0.01 grams percent of the known value over the range 0.04 grams to 0.40 grams percent in analysis of commercially whole blood controls.
2. The precision of the analysis shall be such as consistently to attain a repro-ductability not greater than ±0.005 grams percent from the mean value in replicate analysis.
3. The blank values yielded by the procedure in analysis of alcohol-free reagents consistently shall be not greater than 0.00 grams percent.
4. Procedures for the analysis of whole blood from living and post mor-tem subjects shall differentiate ethyl alcohol from all other substances.
[[Image here]]
La. Administrative Code, Title 55, part I, § 557, provides:
A. Maintenance, repair and inspection of a gas chromatograph may be performed by certified blood alcohol analysts. This may include but not be limited to cleaning, replacing septums, changing columns, checking gases and flow rates, checking “0” rings and air filters, adjusting temperature settings and any other routine checks that are deemed necessary for accurate performance. A certified blood alcohol analyst may perform diagnostic testing, as instructed by a service engineer from the manufacturer. Following each maintenance or repair, inspection of the instrument shall include running a known alcohol standard to insure that the instrument is in proper working order. The gas chromatograph shall be inspected and certified by the department at least every 180 days and the certificate issued shall be proof as to the certification and accuracy of the instrument. A log shall be maintained on each gas chromatograph and all inspections and certifications noted therein.
*1147 B. A log book listing all repair work, maintenance and inspection l^shall be kept and will be available for inspection. The minimum information required in the log book shall state the date, time, nature of work, and name of person(s) performing task.
C. At the time of the periodic inspection and certification, the analyst or technician performing said inspection shall perform at least four analyses, the first three of which shall each utilize certified reagent solutions with alcohol concentrations between 0.04 and 0.30 grams percent. The fourth analysis shall utilize a known reagent solution of acetone and ethyl alcohol mixed with deionized water to check the resolution of the gas chromatograph.
D. The department shall formulate a program for the inspection and certification of all gas chromatographs being used for blood alcohol analyses in this state. The completion of the initial inspection and certification shall be on or before January 20, 1992; however, the lack of certification prior to January 20, 1992 shall not be grounds for the disqualification of the accuracy or authenticity of the results obtained from the use of any such gas chromatograph.
When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court’s discretion, ie., unless such ruling is not supported by the evidence. See State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 280-81. However, a trial court’s legal findings are subject to a de novo standard of review. See State v. Hunt, 2009-1589 (La.12/1/09), 25 So.3d 746, 751.
Prior to trial, the defendant moved to suppress “the blood test” for various reasons, including the State’s alleged failure to show strict compliance with detailed procedures to insure the integrity and reliability of the chemical test, including provisions for the repair, maintenance, inspection, cleaning, certification, and chemical accuracy. Following a hearing, the trial court denied the motion to suppress.
At the motion to suppress hearing, the State presented testimony from Louisiana State Police Forensic Scientist Leah Meade. Meade was familiar with the Louisiana Administrative Code requirements regarding the analysis of blood evidence. She had successfully performed certification testing in accordance with that code and had received a certificate from the Louisiana State Police Crime Lab | ⅞4 certifying that she was qualified to perform blood-alcohol analysis. She stated that, as a certified blood-alcohol analyst, she performed maintenance, repair, and inspection of the gas chromatograph she used to analyze blood evidence. She testified the gas chromatograph was calibrated every time she used it, and maintenance was performed on the instrument every six months. She stated a logbook listing all repair work, maintenance, and inspection on the gas chromatograph was available for inspection at State Police Headquarters, but she did not have her calibration file with her at the hearing. She testified she personally calibrated the gas chroma-tograph on the day she analyzed the defendant’s blood, and the instrument was working properly. She indicated all requirements imposed on the crime lab by the Administrative Code were followed throughout the process of analyzing the blood sample obtained from the defendant by John Shutts, a registered nurse.
The trial court did not err or abuse its discretion in denying the motion to suppress the results of the analysis of the blood sample obtained from the defendant. The State showed strict compliance with the detailed procedures adopted to *1148 secure the efficacy and reliability of the chemical test. Additionally, the defendant had no right to refuse to submit to a chemical test, because there was probable cause to believe he had violated La. R.S. 14:98, and a fatality had occurred. See La. R.S. 32:666(A)(l)(a)(i). Therefore, no Miranda warning was required prior to the blood test. Moreover, the defendant was read his Miranda rights several times pri- or to his blood being drawn.
These assignments of error are without merit.
DUE PROCESS VIOLATIONS
In pro se assignment of error number 4, the defendant alleges “[tjhere was a plethora of instances of testimony, documentation and evidence relevant to identification, probable cause and blood evidence that was • submitted against the | ^.defendant in violation of due process of Law.” He claims the prosecution had knowledge of altered documents, false testimony, and tainted evidence, “but sadly, and consistently, from the onset[,] condoned, covered it up[,] and not once made a good faith effort to correct any of it. Instead, the [p]rosecutor vouched for his lying witnesses[sic] credibility. The [p]rosecutor’s actions demonstrate a flagrant and a very bold disregard for due process of law.”
This assignment of error concerns matters addressed in other assignments of error or not preserved for review. An irregularity or error cannot be availed of after verdict unless, at the time the ruling or order of the court was made or sought, the party made known to the court the action which he desired the court to take, or of his objections to the action of the court, and the grounds therefor. See La. C.Cr.P. art. 841(A). See also La.Code Evid. art. 103(A)(1) (“Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected, and ... [w]hen the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection[.]”).
This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the defendant’s convictions and sentences on counts I and II are affirmed.
CONVICTIONS AND SENTENCES ON COUNTS I AND II AFFIRMED.

. Predicate # 1 was set forth as the defendant's September 3, 1999 conviction, under Twenty-second Judicial District Court Docket #302818, for second-offense DWI (amended from third-offense DWI). Predicate # 2 was set forth as the defendant's November 17, 1999 conviction, under Twenty-second Judicial District Court Docket #311661, for third-offense DWI. Predicate # 3 was set forth as the defendant's October 29, 2001 conviction, under Twenty-second Judicial District Court Docket # 327645, for fourth-offense DWI.

. In regard to count I, the jury also found the defendant had previously received the benefit of a suspended sentence and probation as a fourth DWI offender after serving the minimum mandatory sentence required by law. See La. R.S. 14:98(E)(4)(b).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The Blockburger test is as follows:
The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
Blockburger, 284 U.S. at 304, 52 S.Ct. at 182.

. The court noted that, due to the absence of a witness, it had agreed to begin, but not complete the hearing on the motion to suppress.

. The defendant only challenged the trial court’s ruling on the motion to quash.