NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0489

STATE OF LOUISIANA

VERSUS

JONATHAN S. LUPER

*Judgment Rendered:* NOV 1 5 2019

* * * * * * * *

Appealed from the
22nd Judicial District Court
In and for the Parish of Washington
State of Louisiana
Case No. #16 CR10 129965

The Honorable William J. Knight, Judge Presiding

* * * * * * * *

Gwendolyn K. Brown
Baton Rouge, Louisiana

Counsel for Defendant/Appellant
Jonathan Luper

Warren L. Montgomery
District Attorney
Matthew Caplan
Assistant District Attorney
Covington, Louisiana

Counsel for Appellee
State of Louisiana

* * * * * * * *

BEFORE: McDONALD, THERIOT, AND CHUTZ, JJ.

**THERIOT, J.**

Defendant, Jonathan Luper, was charged by bill of information with aggravated crime against nature, a violation of La. R.S. 14:89.1. He pled not guilty. After a trial by jury, defendant was found guilty as charged. The trial court imposed a term of thirty-two years imprisonment at hard labor, to be served without the benefit of probation, parole, or suspension of sentence. Defendant now appeals. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On July 13, 2015, Department of Child and Family Services ("DCFS") employee Felicia Hillhouse was assigned to investigate an allegation of child neglect occurring in Washington Parish, Louisiana. Bogalusa Police officers had responded to a complaint of four unaccompanied young children in a Bogalusa park. The children were collected and brought to the DCFS office. One of the children was four-year-old J.E.[1] The children were "very, very dirty" with insect bites and lice. Hillhouse went to the children's home to speak with the parents, who had been at home asleep when law enforcement first located them. Hillhouse described the home in which the children were living to be very dirty and noted flies "all over the home." She noted a strong smell of urine and that the house had the "smell of not being cleaned in quite a while." When asked to be shown where the children sleep, she was directed to a urine-soaked mattress on the floor that all of the young children living in the house were expected to share.

Also living in the house were six adults, including defendant, defendant's sister Kelly, who was J.E.'s mother, and her boyfriend Christopher "Rudy"

---

[1] In accordance with La. R.S. 46:1844(W), the initials of the minor victim will be used to identify him.

Bennett. J.E. and his three siblings were placed with Christopher's mother, Jennifer Bennett, and the initial investigation was closed.[2]

In August 2015, Ms. Bennett noticed that J.E. began to exhibit sexualized behavior. J.E. was initially taken to a pediatrician for a medical exam, then was later taken to the Audrey Hepburn Care Center at Children's Hospital to be evaluated by a medical team that specialized in assessing physical and sexual abuse. In September 2015, Hillhouse received additional reports regarding inappropriate behavior from J.E. According to the reports, J.E. was "acting out sexually" at home and at school, touching his brothers and sisters on their genitals, and attempting to "hump" his sister. He was also attempting to put items in his anus. Later, J.E. disclosed that he had been sexually abused by defendant.

In November 2015, Hillhouse spoke with defendant. After initially denying ever supervising the children, he later admitted he "may have watched them a few times." After considering statements defendant made to police, in addition to what she had learned in her own investigation, Hillhouse validated claims of sexual abuse, fondling, and manipulation against defendant. Hillhouse acknowledged that one of the children had named "Desmond" as a "perpetrator" and that she later learned that "Desmond" was defendant's first cousin, Desmond Warren, but she explained that she did not speak with Desmond because his identity and whereabouts were unknown to her at that time.

Ms. Bennett testified about her time caring for the four children, beginning in July 2015. Four-year-old J.E. was the oldest of the four children. In August 2015, Ms. Bennett observed J.E. removing one sister's underwear and licking her genitals and attempting to put toys in his anus. Soon thereafter, J.E. was put into a bedroom by himself. She confirmed that she brought J.E. to the Audrey Hepburn Care Center in August 2015. Then, in September 2015, J.E. disclosed to Ms.

---

[2] Initially, it was believed that Christopher was the father of all four children, but it was later revealed that he was the biological parent of only the two youngest children.

Bennett that defendant had put his finger in J.E.'s rectum and urinated on him. Additionally, J.E. told Ms. Bennett that defendant "taught him how to suck a birdie." Ms. Bennett understood "birdie" to mean penis. Ms. Bennett subsequently called J.E.'s DCFS case manager. She explained that defendant would sometimes babysit the children. Ms. Bennett also acknowledged that J.E. once told her that defendant "did things to him" while "Desmond" was around. She did not know Desmond well, but she knew he was Kelly and defendant's cousin. She said that J.E. told her Desmond and defendant would call J.E. "their little bitch[]."

Lieutenant David Miller of the Bogalusa Police Department, a nine-year veteran of sex crime investigations, testified at trial. He was brought into the case in September 2015 after receiving a referral from DCFS regarding an allegation of sexual abuse of J.E. by defendant. Lt. Miller stated that J.E. underwent a "forensic interview" at Hope House at the Children's Advocacy Center ("CAC"), which Lt. Miller observed from outside the room. During the interview, J.E. disclosed that he had been sexually abused by defendant.

Soon thereafter, Lt. Miller obtained an arrest warrant for defendant. Defendant had moved out of the home he shared with his sister and J.E. Lt. Miller located defendant at his new residence in Franklinton on October 13, 2015, and arrested defendant. While at the Franklinton residence, defendant was read his **Miranda** rights, and he indicated he understood them. Defendant asked the arresting officers if he could go back inside the house to put on some shoes. The officers agreed and accompanied defendant to his bedroom. While in the room, Lt. Miller noticed a padlocked closet door. When asked why it had a padlock, the now nervous defendant indicated it was merely storage for some of his sister's items. Noting defendant's "weird" behavior, Lt. Miller asked for consent to search the closet, which defendant ultimately gave by signing a written consent form. A

4

search of the closet revealed containers filled with used children's diapers. When questioned about the diapers, defendant admitted his semen would be found inside them. Defendant also initially explained to Lt. Miller that "[t]hose are my sister's kids' diapers and I should have thrown them away."

Defendant was brought back to the police station to be further interviewed, after he signed a **Miranda** waiver form. Defendant then gave a video recorded statement that was played for the jury. Defendant voluntarily provided a buccal DNA swab. Defendant was interviewed on video again the next day by another officer, after again waiving his **Miranda** rights via written form. The second video was also played for the jury.

In the first recorded interview, defendant advised that he can read "a little bit," but that he understood his rights as given to him by Lt. Miller. Defendant initially denied inappropriately touching J.E. On several occasions, Lt. Miller explained to defendant that help was available for people like him, but only if he told the truth. also denied any inappropriate contact with Desmond or Kelly. Defendant told Lt. Miller that he was still a virgin. Defendant alleged that a teenager named "Crystal" had inappropriate conversations with J.E. Defendant also mentioned "Terry Anderson" as being a potential source of J.E.'s claim regarding defendant and his sister.

Regarding the diapers, defendant claimed they had been in the closet for five or six months. Defendant altered the explanation given to Lt. Miller at the scene, and said he found the diapers on the side of the road or in dumpsters. He explained that he enjoyed smelling the diapers and used them to collect his semen. He denied that the diapers came from his family members or that he had been using them recently. He admitted he started using diapers in that fashion from the age of 13 years old. Defendant denied thinking of children in a sexual way or that he had ever been molested as a child.

In his second interview, conducted by another investigator, defendant again waived his **Miranda** rights. Defendant initially denied inappropriate contact with J.E., and he could not explain why J.E. accused him of such conduct. Again, defendant was offered help and counselling if he was truthful, and it was suggested that he would not go to jail. He later conceded J.E. once walked in on him masturbating and that he merely explained to J.E. what he was doing. He claimed J.E. then went to tell Kelly what he had seen. Defendant admitted J.E. may have heard him and Desmond talking about oral sex and later explained J.E. had asked him about oral sex as well.

Later in the second interview, defendant told the investigator that he told J.E. how to perform oral sex. Eventually, defendant admitted he showed J.E. how to masturbate, at first with defendant demonstrating on himself, later moving J.E.'s hand on J.E.'s penis. He also told the investigator that he ultimately showed J.E. how to masturbate on two occasions and about oral sex once. Defendant explained Desmond did not participate in any sexual acts with J.E.

Lt. Miller obtained DNA samples from the four children in DCFS custody. Subsequent testing revealed seminal fluid in an examined diaper and that the chance of its contributor being someone other than defendant was one in 2.53 quintillion. There was insufficient DNA collected to determine whether the children could be excluded as contributing material to the tested diaper.

Following defendant's first interview, Lt. Miller learned Desmond Warren was 14 or 15 years old. Lt. Miller spoke with Desmond and did not find probable cause to implicate Desmond as a suspect in the sexual abuse of J.E. Under cross-examination, Lt. Miller acknowledged that defendant told him that J.E. had said someone named "Crystal" had spoken to him about sexual acts, but Lt. Miller did not follow up on that information as he did not find defendant credible. He explained a similar course of action regarding Terry Anderson. Lt. Miller testified

he was not given the names of the other adults living in the house where the children were initially found to be living, and he did not investigate them. Moreover, Lt. Miller did not attempt to determine who "everybody" was in relation to J.E. saying that "everybody" saw defendant touch J.E.'s penis. Lt. Miller reasoned that because J.E. consistently identified defendant as the one who sexually abused him, defendant was the primary focus of his investigation.

J.E., seven-years-old at the time of trial, testified. After a brief direct examination from the State, defense counsel extensively cross-examined J.E. regarding what he remembered from his initial disclosure and his CAC interview. When asked whether he remembered telling a doctor at Children's Hospital that his dad had "put a blue lighter up [his] butt," J.E. replied that he did not remember saying that and further stated that his dad had not done that.[3] He explained to the jury that defendant was a "bad man" because he did "bad stuff" to him on his penis and buttocks, and that it made him scared. He also testified that defendant once tried to cut his penis off. J.E. denied committing any sexually inappropriate acts with his sister or telling anyone that Desmond touched his penis, that defendant performed oral sex on Desmond, or that defendant performed oral sex on Kelly.

The State's last witness was JoBeth Rickels, a forensic interviewer trained in talking to child victims. Rickels conducted a videotaped interview with J.E. in September 2015 at the CAC, which was played for the jury. Rickels explained J.E.'s statement that "everybody" saw defendant touching him was likely a product of a just-turned-four-year-old thinking his parents already know and see everything. Thus, she disregarded the statement as just an expression of his understanding at such a young age. She conceded that she did not ask follow-up

---

[3] J.E.'s medical records and videotaped interview from Children's Hospital are not in evidence. While the videotaped CAC interview did contain this allegation involving the lighter, J.E. made the allegation against the defendant and not his dad. Furthermore, it appears that J.E.'s references to his "dad" in the CAC interview were actually to Christopher and not his biological father, with whom he lived at the time of trial.

questions regarding whether Desmond touched J.E., or if J.E. saw defendant performing oral sex on Kelly, because the focus of that interview was the suspected conduct of defendant. Though she noted that J.E. had difficulty understanding truth versus lies, and she was somewhat unsure as to whom he was referring in some of their exchanges, she explained his statements to her were consistent in regard to who did the touching and with what.

In the CAC interview with J.E., which was played for the jury, he said defendant touched him more than once under his clothes on his butt and "pee-pee" with J.E.'s clothes pulled down, and that defendant used his mouth and hands. J.E. alleged that defendant attempted to "cut [his] pee-pee off" with Desmond's knife. J.E. also said "everybody" saw defendant touch his "pee-pee" and that defendant tried to touch everybody's. J.E. told defendant to stop, but "he done it anyway." J.E. also claimed to have seen defendant touch his mother, defendant's sister, with his mouth between the legs.

Additionally, J.E. at first said Desmond touched his butt with his hands as well, and put a flashlight in his ear, but then said defendant and Desmond only touched each other in front of him. J.E. said that he saw defendant touch Desmond's "pee-pee" with his mouth and "everything." In a later part of the interview, J.E. appeared to initially have some difficulty distinguishing between the truth and a lie, but later demonstrated he could. J.E. said defendant putting his mouth on J.E.'s "pee-pee" was the truth.

In defendant's case in rebuttal, the jury heard the testimony of three of defendant's family members, including his cousins Lacey and Desmond Warren. Lacey Warren testified as to her knowledge of defendant's lack of criminal history and his special education needs. She also testified that J.E. lived in several places and often had multiple unrelated people living with him and his family. She

8

revealed defendant liked to play with and wear diapers as a child of eight or nine years old.

Desmond testified he never acted inappropriately with J.E. He also asserted defendant did not have a reputation in the community for sexually assaulting children. Although Desmond testified he was unaware that defendant was sexually aroused by diapers, he was aware that defendant collected them. He also denied telling Lt. Miller that he and defendant called J.E. their "little bitch[]."

Finally, defendant's aunt, Mendy Lucito, testified. She testified defendant did not have a reputation for sexually assaulting children. Lucito further testified that defendant had been in special education due to a learning disability. She acknowledged that defendant "had a thing with diapers" when he was little, but she was unaware of defendant's practice of masturbating into soiled diapers.

## ASSIGNMENT OF ERROR # 1: LUSTFUL DISPOSITION EVIDENCE

In assignment of error number one, defendant contends the trial court erred when it permitted the State to introduce evidence of his sexual use of soiled children's diapers. Defendant argues that evidence of his masturbating into the dirty diapers was both highly prejudicial and irrelevant regarding whether he committed the alleged offense against J.E. In defendant's view, without this prejudicial evidence, defendant would never have been convicted with only the testimony of J.E., J.E.'s recorded CAC interview, and defendant's own recorded police interviews. The State argues that when considering the trial court's stated reasoning for admitting the evidence, defendant does not demonstrate an abuse of discretion.

Before trial, the State filed notice that it intended to introduce "lustful disposition" evidence in the form of the soiled diapers, and defendant in turn filed a motion to exclude that same evidence. In orally denying defendant's motion to exclude the evidence, the trial court found that the alleged conduct reflected a

lustful disposition towards children, and the evidence was more probative than it was prejudicial. The court noted that the diapers found were locked in a closet, and they were not adult diapers. The trial court did exclude as irrelevant other evidence relating to "animal porn, bestiality or other adult sexual matters."

Generally, courts may not admit evidence of other crimes or bad acts to show defendant is a man of bad character who has acted in conformity with his bad character. La. Code Evid. art. 404(B)(1). However, the State may introduce evidence of other crimes if the State establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, or preparation, or when the evidence relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. Code Evid. art. 404(B)(1). Even when the other crimes evidence is offered for a purpose allowed under Article 404(B), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. **State v. Taylor**, 2016-1124, p. 12 (La. 12/1/16), 217 So.3d 283, 292. Moreover, the State must provide defendant with notice that it intends to offer prior crimes evidence. **Taylor**, 2016-1124 at p. 12, 217 So.3d at 292. Additionally, the State must prove by a preponderance of the evidence that defendant committed the other acts. La. Code Evid. art. 1104; **Huddleston v. United States**, 485 U.S. 681, 689-92, 108 S.Ct. 1496, 1501-02, 99 L.Ed.2d 771 (1988); **State v. Brue**, 2009-2281 (La. App. 1st Cir. 5/7/10), 2010 WL 1838383, at *6 n.4, writ denied, 2010-1317 (La. 1/7/11), 52 So.3d 883.

Further, La. Code Evid. art. 412.2(A) provides in pertinent part:

> When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

10

Louisiana Code of Evidence article 402 provides that all relevant evidence is admissible. However, under La. Code Evid. art. 403, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Evidence is deemed relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. Code Evid. art. 401.

Prior crimes differing from those at issue in a prosecution are still probative to establish a defendant's "lustful disposition." See, e.g., **State v. Friday**, 2010-2309, p. 18 (La. App. 1st Cir. 6/17/11), 73 So.3d 913, 927, writ denied, 2011-1456 (La. 4/20/12), 85 So.3d 1258. Moreover, the provisions of La. Code Evid. art. 412.2 are not limited only to sexual offenses defined by state law, but also include a "broad range of behavior" such as "acts which indicate a lustful disposition." **State v. Layton**, 2014-1910, pp. 5-7 (La. 3/17/15), 168 So.3d 358, 360-62. It is not necessary, for purposes of Article 412.2 testimony, for defendant to have been charged, prosecuted, or convicted of the "other acts" described. **State v. Berry**, 51,213, p. 30 (La. App. 2d Cir. 5/17/17), 221 So.3d 967, 986, writ denied, 2017-1146 (La. 12/17/18), 257 So.3d 1260. Furthermore, the "acts which indicate a lustful disposition" are not limited to those acts that are identical or similar in nature to the charged offense. **State v. Wright**, 2011-0141, pp. 9-11 (La. 12/6/11), 79 So.3d 309, 315-16; see also, **State v. Farrier**, 2014-0623, pp. 11-15 (La. App. 4th Cir. 3/25/15), 162 So.3d 1233, 1242-43 (a recording of defendant's phone conversation while in custody, wherein he stated that the victim and three others had caught him watching child pornography on his computer, that he cannot fight "this," and that he hoped for leniency as "a first offender," was deemed relevant in his trial for sexual battery of a juvenile); **State v. Preston**, 47,273, pp. 9-10 (La.

App. 2d Cir. 8/8/12), 103 So.3d 525, 531-32 (defendant's prior conviction for unauthorized entry into the home of a 13-year-old girl was admissible in sexual battery prosecution as an integral part of the prior offense to prove defendant's lustful disposition toward children); **State v. Hotard**, 2007-0498, pp. 4-7 (La. App. 5th Cir. 12/27/07), 975 So.2d 16, 19-20 (letter written by defendant containing sexual comments about his minor daughter and testimony of his ex-wife about his sexual interest in minor niece held admissible in prosecution for molestation of a juvenile); **State v. E.J.F.**, 2008-674, p. 9 (La. App. 3d Cir. 12/10/08), 999 So.2d 224, 231 (photographs related to prior federal conviction for possession of child pornography admissible in prosecution for aggravated incest as photographs relevant for purposes of showing defendant's lustful disposition toward young girls).

A trial court's ruling on the admissibility of the additional other crimes evidence will not be disturbed absent an abuse of discretion. **State v. Altenberger**, 2013-2518, p. 8 (La. 4/11/14), 139 So.3d 510, 515 (per curiam); **State v. Jackson**, 2018-0261, p. 15 (La. App. 1st Cir. 11/2/18), 265 So.3d 928, 939, writ denied, 2018-1969 (La. 4/22/19), 268 So.3d 304; see also **State v. Wright**, 2011-0141 at p. 13, 79 So.3d at 317.

Here, as the trial court noted, defendant was found in possession of soiled children's diapers, for which he gave varying implausible explanations. The focus of this sexual attention was evidently limited to children's diapers. Though defendant argues "it is quite possible that [defendant] simply used the diapers for the ability to absorb his seminal fluid," he does not explain how this relates to the fact he collected soiled diapers of unknown origin in boxes within a locked closet in his room. The jury was not improperly permitted to make the inference that such behavior is indicative of a sexualized view of young children. Defendant fails to show the trial court abused its considerable discretion in denying his motion to

exclude evidence regarding his collection of soiled children's diapers and his use thereof. Moreover, the State presented evidence from the victim, J.E., as well as defendant's own recorded statements to police, that he committed the offense of aggravated crime against nature. Even assuming arguendo that the trial court did err, the effect of that error was rendered harmless by the overwhelming evidence of guilt presented by the State. **State v. Becnel**, 2016-1297, p. 10 (La. App. 1st Cir. 4/20/17), 220 So.3d 27, 34, writ denied, 2017-1023 (La. 3/9/18), 238 So.3d 451 (observing that the erroneous admission of other crimes evidence is subject to a harmless-error analysis, which considers whether the jury's verdict was "surely unattributable to the error"). This claim is without merit.

## ASSIGNMENT OF ERROR #2: HEARSAY

In his second assignment of error, defendant asserts that the trial court erred when it admitted into evidence medical records and a videotaped interview generated during the interview at Children's Hospital, before J.E. made his initial disclosure of abuse. Defendant asserts the interview and its contents do not fit into a hearsay exception, and the trial court committed error when it admitted the evidence. Defendant reurges his claim from the previous assignment of error that the evidence was otherwise insufficient to convict him but for this error. The State notes the evidence defendant complains of was never introduced into evidence.

Defendant filed a motion to exclude evidence of J.E.'s statements to medical personnel at the Audrey Hepburn Care Center. The trial court took the motion under advisement and proceeded to voir dire. Following the testimonies of Ms. Hillhouse and Ms. Bennett, the trial court denied defendant's motion, citing **State v. Brand**, 2016-0960 (La. App. 1st Cir. 12/22/16), 2016 WL 7407414, writs denied, 2017-0167 (La. 9/15/17), 225 So.3d 478 & 2017-0131 (La. 9/15/17), 225 So.3d 479. The trial court noted that at the time of the August 2015 interview at Children's Hospital, J.E. had not yet made a disclosure of sexual abuse, although

13

he exhibited suspicious behavior and hypersexualized activity inappropriate for a child of his age. Consequently, the court found the August 2015 interview was intended for medical diagnosis under La. Code Evid. art. 803(4) and not a forensic investigation.

Pretermitting discussion of **Brand** and the admissibility of the statements, it appears the State never introduced medical records into evidence nor did it play the video recording.[4] In any case, inadmissible hearsay that is merely cumulative or corroborative of other testimony adduced at trial is considered harmless. **Brand**, 2016 WL 7407414, at *7 (citing **State v. Spell**, 399 So.2d 551, 556 (La. 1981)). J.E.'s interview with the CAC and his generally consistent allegations, coupled with defendant's inculpatory statements in his second interview, render any error, assuming such occurred, harmless. See **Brand**, 2016 WL 7407414, at *6.

## ASSIGNMENT OF ERROR # 3: EXCESSIVE SENTENCE

In his final assignment of error, defendant argues he received an excessive sentence from the trial court. In defendant's view, the trial court did not give adequate consideration to the mitigating factors designated in La. Code Crim. P. art. 894.1, and it erred when it denied his motion to reconsider sentence. Defendant posits that because his crime did not involve penetration or occur over time, his sentence should have been shorter. The State contends defendant received a sentence closer to the minimum, and from that it is apparent the trial court considered both aggravating and mitigating circumstances.

The Eighth Amendment to the United States Constitution and Article I, § 20, of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. Although a sentence falls within statutory limits, it may be excessive. **State v. Sepulvado**, 367 So.2d 762, 767 (La. 1979); **State v. Dufrene**, 2017-1496,

---

[4] At most, Lt. Miller stated that he learned from the interview that J.E. identified defendant as the perpetrator of his sexual abuse. The statement was not expressly objected to, but was perhaps subject to a previous objection relating to evidence derived from the interview as a whole.

14

p. 15 (La. App. 1st Cir. 6/4/18), 251 So.3d 1114, 1125. A sentence is considered constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. **State v. Spikes**, 2017-0087, p. 3 (La. App. 1st Cir. 9/15/17), 228 So.3d 201, 204. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. See **State v. Ford**, 2017-0471, p. 15 (La. App. 1st Cir. 9/27/17), 232 So.3d 576, 587, writ denied, 2017-1901 (La. 4/22/19), 268 So.3d 295. Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of La. Code of Crim. P. art. 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. **State v. Letell**, 2012-0180, pp. 8-9 (La. App. 1st Cir. 10/25/12), 103 So.3d 1129, 1138, writ denied, 2012-2533 (La. 4/26/13), 112 So.3d 838.

The articulation of the factual basis for a sentence is the goal of La. Code Crim. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. Code Crim. P. art. 894.1. **State v. Lanclos**, 419 So.2d 475, 477-78 (La. 1982); **State v. Ducote**, 2016-1457, p. 5 (La. App. 1st Cir. 4/12/17), 222 So.3d 724, 727. The trial judge should review defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. See **State v. Jones**, 398 So.2d 1049, 1051-52 (La. 1981); **State v. Scott**, 2017-0209, p. 5 (La. App. 1st Cir. 9/15/17), 228 So.3d 207, 211, writ

15

denied, 2017-1743 (La. 8/31/18), 251 So.3d 410. On appellate review of a sentence, the relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. **State v. Thomas**, 98-1144 (La. 10/9/98), 719 So.2d 49, 50 (per curiam); **State v. McCasland**, 2016-1178, p. 4 (La. App. 1st Cir. 4/18/17), 218 So.3d 1119, 1123.

In sentencing defendant, the trial court noted it was "painfully aware" of the circumstances of the case, and that defendant "did some heinous things." The court found the La. Code Evid. art. 412.2 evidence presented at trial was "very disturbing." Observing that J.E. was a minor under defendant's control and supervision, the court found a lesser sentence would deprecate the seriousness of the offense. The court further observed the trauma and emotional problems suffered by J.E. will manifest for a long time. The trial court did not enumerate any mitigating factors, though none were presented by defendant at sentencing. In fact, defendant only does so for the first time in brief, noting that he has no prior criminal history, and without evidentiary support, that he was "learning disabled and childlike." Defendant's capacity and competency were not raised by defendant before trial. Moreover, contrary to defendant's assertion that there is "no evidence that the young child victim had injury for the incident or any lasting emotional trauma," it was J.E.'s inappropriate sexual behavior directed at his siblings that began the investigation that culminated in defendant's conviction.

Given the evidence presented at trial and the trial court's specific reasoning in determining defendant's term of incarceration, we cannot say the trial court abused its broad sentencing discretion in imposing a thirty-two-year term of imprisonment. This claim is also without merit.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED.**